UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| TENNESSEE RIVERKEEPER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:23-cv-00749 |
| | ) | Judge Aleta A. Trauger |
| v. | ) | |
| | ) | |
| ARDAVAN AFRAKHTEH, | ) | |
| | ) | |
| Defendant. | ) | |

# MEMORANDUM

Ardavan Afrakhteh has filed a Motion to Dismiss (Doc. No. 14), to which Tennessee Riverkeeper, Inc. filed a Response (Doc. No. 17), and Afrakhteh filed a Reply (Doc. No. 19). On May 10, 2024, the court entered an Order (Doc. No. 20) converting Afrakhteh's motion, in part, to a motion for summary judgment and requiring the parties to file additional materials necessary to addressing the relevant issues in connection with Rule 56. Tennessee Riverkeeper filed a subsequent Response (Doc. No. 21), and Afrakhteh filed a Notice of Additional Materials (Doc. No. 22). For the reasons set out herein, the converted motion will be granted.

## I. BACKGROUND

### A. The CWA, the NPDES, and Tennessee's General Permit for Construction

The Clean Water Act ("CWA") imposes "a default regime of strict liability," whereby the discharge of any covered pollutant into the waters of the United States amounts to a violation of the statute unless subject to a specific exception. *Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281, 284 (6th Cir. 2015) (quoting *Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll Cty.*, 268 F.3d 255, 268–69 (4th Cir. 2001)). That zero-tolerance approach, however, is only a baseline, because the CWA also makes individualized exceptions—albeit limited, conditional ones—widely available in connection with the National Pollutant Discharge Elimination System

("NPDES") permitting system. An NPDES permit authorizes a covered party to discharge otherwise-barred effluents into waters covered by the CWA, subject to "limits on the type and quantity of pollutants that can be released," among other requirements. *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 102 (2004). Discharge of pollutants into the waters of the United States without an NPDES permit, or in violation of the terms of an NPDES permit, is typically a violation of the CWA, but an authorized discharge made in compliance with a permit is not. 33 U.S.C. §§ 1311(a), 1342(a), 1365(f). As a result, the NPDES system allows regulators to fashion the CWA's prohibition into a more tailored regime in which some discharges are tolerated, within limits and subject to oversight and conditions.

The Tennessee Department of Environment and Conservation ("TDEC"), which administers the NPDES in Tennessee, has elected to regulate runoff-based discharges from construction sites through a statewide General Permit for Discharges of Stormwater Associated with Construction Activities ("General Permit"), which a developer or other party may opt into by filing a sufficient "Notice of Intent," or "NOI." (Doc. No. 17-1 at 6–8.) The General Permit potentially applies to an array of "operators" of a construction site—including developers, builders, and contractors—as long as the relevant party has some sufficient degree of "operational control" over the development. (*Id.* at 12.) Accordingly, any given project may have multiple recognized operators at a time. By the terms of the General Permit, "[p]ermittees are jointly and severally liable for a violation related to construction activities that affect the same project site, unless a permittee affirmatively demonstrates to the satisfaction of the Department that its own action, or failure to act, was not a cause of the violation." (*Id.* at 11.)

The General Permit recognizes that sometimes control and/or operation of a construction project may change hands after an NOI was filed but before the underlying project is finished. In

2

such a situation, the General Permit requires the new operator to seek its own approval to continue the project:

> New operators proposing to conduct construction activities at a site with existing coverage must submit an NOI. The NOI should be submitted prior to the new operator commencing work at the site. The NOI must reference the project name and tracking number assigned to the primary permittee's NOI. The NOI may not need to be submitted immediately upon assuming operational control if the portion of the site controlled by the new operator is inactive and all the previously disturbed areas are permanently stabilized.
>
> A new operator working as a residential home builder may submit Form CN-1249, the Stormwater Pollution Prevention Plan (SWPPP) for Single Family Residential Homebuilding Sites.

(*Id.* at 16.) A party that is late in filing its NOI may still do so, but, "[w]hen a late NOI is submitted," any resultant "authorization is only for future discharges," meaning that "[a]ny prior, unpermitted, discharges or permit noncompliances are subject to penalties" under the Tennessee Water Quality Control Act ("TWQCA"), Tenn. Code Ann. § 69-3-115. (*Id.*) Similarly, a construction site operator who made a CWA-covered discharge before opting into the General Permit or receiving another NPDES permit could be liable under the CWA. *See* 33 U.S.C. §§ 1311(a), 1342(a).

The General Permit also establishes procedures for terminating coverage, providing that "[p]rimary permittees wishing to terminate coverage under this permit must submit a completed Notice of Termination (NOT) form," which TDEC reserves the right to review and, if necessary, reject. (*Id.* at 56–58.) The General Permit recognizes three situations in which termination of coverage may be granted: the actual completion of the project; the permittee's obtainment of coverage under a different permit; or that the "permittee has transferred control of all areas of the site for which he is responsible (including, but not limited to, infrastructure, common areas, stormwater drainage structures, sediment control basin) under this permit to another operator, and that operator has submitted an NOI and obtained coverage under this permit." (*Id.* at 56–57.)

3

"An owner's or developer's responsibility to comply with requirements of [the General Permit] extends until permit coverage is terminated in accordance with" the General Permit's procedures. (*Id.* at 11.)

**B. The CWA's Citizen Suit Provision and This Case**

The CWA grants the government[1] a significant "enforcement arsenal," including "administrative, civil, and criminal sanctions." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 53 (1987). Congress, however, chose not to leave enforcement decisions entirely in the hands of regulators. Rather, the CWA includes a "citizen suit" provision that permits a private party with a constitutionally sufficient injury to "commence a civil action on his own behalf . . . against any person . . . who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a).

A private party's authority to enforce the CWA, however, is narrower than a regulatory agency's. For one thing, a private party cannot file a citizen suit without giving a 60-day notice to the government and the potential defendant, and, if the government chooses to pursue the matter itself, the citizen plaintiff may not do so unless the government fails to prosecute the matter diligently. *See* 33 U.S.C. § 1365(b). Moreover, because the defendant in a citizen-initiated case must be "alleged to be in violation of the Act," the citizen suit provision "does not permit citizen suits for wholly past violations." *Gwaltney*, 484 U.S. at 64. After all, a wholly past violator is not alleged to *be* in violation of the Act, only to *have been*. Because the citizen suit provision uses the phrase "alleged to be," it is not necessarily fatal to the suit if the facts later

---

[1] The CWA relies on a cooperative state-federal structure for its administration, meaning that sometimes enforcement may be performed by the federal Environmental Protection Agency and sometimes it may be performed by a state agency. For clarity, the court will speak generally in terms of "government" authority under the Act, unless it is necessary to draw a more specific distinction.

4

show that the plaintiff was mistaken in believing that the violations were continuing. However, the violations must be alleged, in good faith, to be either ongoing or recurring, as of the date the complaint in the relevant litigation was filed. *Id.* at 64.

On July 25, 2023, Tennessee Riverkeeper filed a CWA citizen suit against Afrakhteh, as the sole defendant, in which it alleges that Afrakhteh violated the CWA in connection with stormwater runoff from a 4.8-acre single family residential development that Afrakhteh allegedly owned. (Doc. No. 1 ¶¶ 40–96.) The Complaint describes Afrakhteh's alleged past violations in some detail, but, when it comes to continuing violations, the Complaint merely states generally that "the violations complained of have not ceased, and are ongoing." (*Id.* ¶ 17.) The Complaint, however, does not give details about that assertion.

On October 9, 2013, Afrakhteh filed a Motion to Dismiss, in which he raised a number of alleged issues with Tennessee Riverkeeper's claim. Among other things, Afrakhteh asserted that, while his company, Hill 33, LLC ("Hill 33"), did own the relevant land during the early days of the planned development, it conveyed that land to a third party, BGC Development, LLC ("BGC"), before this lawsuit was commenced. Afrakhteh admits that he and Hill 33 filed an NOI in connection with the property in 2018. (*See* Doc. No. 14-1.) However, he has provided documentation suggesting that, in March of 2022, Hill 33 conveyed the property to BGC.[2] (*See* Doc. No. 14-2.) In May of 2023, BGC sent TDEC a letter requesting that Afrakhteh's rights be transferred to BGC. (Doc. No. 14-3 at 3.) That letter was accompanied by a notice of

---

[2] The economic details of this transaction are not altogether clear. According to the specialty warranty deed, BGC purchased the property for $10 and "other good and valuable consideration." (*See* Doc. No. 14-2 at 1.) There are, presumably, reasons why a developer would be willing to convey a development for a price with such a low cash component—for example, because the purchaser was willing to assume liabilities associated with the project—but the record does not include any explanation of whether that, or something else, accounted for the low price here. Ultimately, though, it does not appear that the specific economic details of the conveyance are relevant to the matter before the court, other than that (1) the purchase occurred and (2) BGC was not an entity controlled or owned by Afrakhteh.

5

termination, signed by Afrakhteh, requesting a termination of his coverage under the General Permit. (*Id.* at 5.) BGC did not file its own separate NOI, however, until June 29, 2023—shortly after this litigation had commenced. (*Id.* at 2.)

In Afrakhteh's initial briefing, he argued that the court could consider his evidence of the sale without exceeding the limited scope of a Rule 12(b)(6) motion. The court, however, ultimately rejected that argument, converted the motion to one for summary judgment pursuant to Rule 12(d), and ordered additional filings by the parties. (Doc. No. 20.) Following the conversion to a Rule 56 motion, Afrakhteh filed a Declaration in which he provides more detail regarding his history with the property. He confirms that the property was formerly owned by Hill 33, of which he is the sole member and manager, but he says that he holds no interest in, and is not a member or officer of, the current owner, BGC. (Doc. No. 22-1 ¶ 3.) Afrakhteh confirms that he completed his notice of termination and that, as he understands matters, he has "fulfilled all the necessary duties" for BGC to take over all responsibilities related to the property under the General Permit. (*Id.* ¶ 6.) Afrakhteh states that he no longer has any control over the development and, indeed, does not even have the authority to physically enter the land itself. (*Id.* ¶ 8.)

Tennessee Riverkeeper filed a Response to the converted motion, in which it does not dispute that Hill 33 transferred the property to BGC before this suit was filed. (Doc. No. 21.) Rather, Tennessee Riverkeeper relies on the argument that, because the termination of Afrakhteh's coverage under the General Permit had not been formally recognized by TDEC,[3] then Afrakhteh is personally responsible for discharges from the site, regardless of the nature of his actual connection, if any, to the property or the discharges themselves,

---

[3]Based on the record, it appears that TDEC still has not formally recognized (or rejected) the termination. However, because the relevant date is the date of the filing of the Complaint, any subsequent events are immaterial.

6

## II. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## III. ANALYSIS

By the plain language of the CWA, whether a cause of action against Afrakhteh is available to Tennessee Riverkeeper depends on whether the plaintiff has plausibly alleged that Afrakhteh has been "in violation" of either an "effluent standard or limitation" or an "order issued by the [EPA] or a State with respect to such a standard or limitation," as of the date on

which this litigation was commenced. 33 U.S.C. § 1365(a). Tennessee Riverkeeper has not identified any formal order at issue in this case, so its reliance on the citizen suit provision must be based on a continuing violation of an effluent standard or limitation. The CWA adopts the following definition of "effluent standard or limitation" for the purposes of the citizen suit provision:

> For purposes of this section, the term "effluent standard or limitation under this chapter" means (1) effective July 1, 1973, an unlawful act under subsection (a) of section 1311 of this title; (2) an effluent limitation or other limitation under section 1311 or 1312 of this title; (3) standard of performance under section 1316 of this title; (4) prohibition, effluent standard or pretreatment standards under section 1317 of this title; (5) a standard of performance or requirement under section 1322(p) of this title; (6) a certification under section 1341 of this title; (7) a permit or condition of a permit issued under section 1342 of this title that is in effect under this chapter (including a requirement applicable by reason of section 1323 of this title); or (8) a regulation under section 1345(d) of this title.

33 U.S.C. § 1365(f). Tennessee Riverkeeper bases its arguments on Afrakhteh's supposed violation of conditions of the General Permit, which is covered by 33 U.S.C. § 1365(f)(7).

The citizen suit provision, however, does not merely require a plaintiff to identify an effluent standard or limitation relevant to its claims; it requires the plaintiff to identify one that the defendant is allegedly continuing to violate. In Tennessee Riverkeeper's Complaint, it identifies seven permit provisions that Afrakhteh is allegedly violating. (Doc. No. 1 ¶¶ 56–96.) Each of those provisions, however, is one that, by its nature, can only be continuously violated by a party with some manner of actual control over the relevant site:

| Provision | Ongoing Issue Addressed |
|---|---|
| General Permit § 1.4.2 | Implementation of stormwater pollution prevention plan (Doc. No. 17-1 at 6) |
| General Permit § 4.1 | Best practicable effluent control technology (*Id.* at 20) |

8

| General Permit § 4.1.1 | Sufficient erosion prevention and sediment controls (*Id.*) |
|---|---|
| General Permit § 5.5.3.1 | Sufficient sediment and erosion controls (*Id.* at 30) |
| General Permit § 5.5.3.5 | Sufficient sediment controls (*Id.* at 34–35) |
| General Permit § 6.3.1 | Actual discharges (*Id.* at 40) |
| General Permit § 6.3.2 | Actual discharges (*Id.*) |

Afrakhteh may have violated some or all of those provisions during earlier phases of the project, but he could not have violated them once he no longer controlled any of the subject property. Insofar as those provisions are now being violated, they are being violated by BGC, not Afrakhteh, who has no control over the relevant physical systems and is making no discharges.

Tennessee Riverkeeper points out that the General Permit envisions joint and several liability in some situations—which Tennessee Riverkeeper interprets to mean that the General Permit would also support a citizen suit against any formal permittee of any site on which violations occurred. By its own terms, however, the General Permit does not attribute every violation to every person with an active NOI connected to the relevant site. Rather, the General Permit grants TDEC the authority to determine whether joint and several liability should apply, based on whether the relevant permittee has demonstrated, to that agency, that "its own action, or failure to act, was not a cause of the violation." (*Id.* at 11.) If TDEC concludes that no such showing has been made, it can, within its discretion, impose liability for a penalty upon a permittee. That discretion is consistent with the structure of the TWQCA, which grants TDEC authority to assess penalties in a wide array of situations. *See* Tenn. Code. Ann. § 69-3-115(a)(1)(A)–(H).

9

This case, however, was not brought by TDEC, nor does the underlying cause of action arise out of the TWQCA. This is a citizen suit under the CWA, and the CWA only authorizes a citizen suit against a party that is actually "alleged to be in violation" of the underlying permit condition. 33 U.S.C. § 1365(a). Regardless of who might be administratively penalized, the only party that could *violate* any of the above conditions on a continuous or recurring basis is a party with at least some measure of actual control over the site.

Admittedly, the Supreme Court has construed the citizen suit provision to require only a "good faith" allegation of an ongoing violation, and one might argue that Tennessee Riverkeeper has a "good faith" belief that it can, as a matter of law, attribute all discharges from the subject property to Afrakhteh, regardless of his actual role. The Supreme Court, however, viewed Congress's decision to permit citizen suits based on good faith accusations as reflecting a "conscious sensitivity to the practical difficulties of detecting and proving chronic episodic violations of environmental standards." *Gwaltney*, 484 U.S. at 65. The type of good faith allegation that the citizen suit provision envisions, then, is a good faith allegation of facts constituting a violation—not a good faith belief in an alternative interpretation of the citizen suit provision that would permit a wider array of claims. Otherwise, every aspiring plaintiff would be entitled to rely on the citizen suit provision, as long as he genuinely believed he should be permitted to do so under the law. The court, therefore, construes the citizen suit provision to require a good faith assertion of facts constituting a continuous or recurring violation, not simply a good faith belief that the continuing violation requirement was satisfied.

Tennessee Riverkeeper's Complaint, however, contains no such good faith allegation of any actual, ongoing violation *by Afrakhteh*. Rather, the Complaint alleges that (1) Afrakhteh is the party named on the NOI associated with the development, (2) he engaged in some past violations, and (3) violations, by *someone* and allegedly attributable to Afrakhteh *for some*

10

*reason*, are continuing to occur from the property. (*See* Doc. No. 1 ¶¶ 2–96.) On its face, the Complaint's language is ambiguous, and the court does not mean to suggest that the problem here is fundamentally one of pleading. Rather, based on the external factual issues that Afrakhteh introduced, the court converted the motion to one for summary judgment so that it could see, based on a factual record, what Tennessee Riverkeeper's ambiguous allegations actually meant and whether they satisfy 33 U.S.C. § 1365(a).

It is now clear that Tennessee Riverkeeper has made no allegation that Afrakhteh was in actual, continuing violation of an effluent standard or limitation, because Tennessee Riverkeeper has not identified any non-past discharges or permit violations that were actually within Afrakhteh's control. Rather, it has merely advanced a legal theory that would treat Afrakhteh as interchangeable with BGC—a party that Tennessee Riverkeeper has not sued or, as far as the record shows, satisfied the notice condition in order to be able to sue—because, when this suit was filed, Afrakhteh's coverage under the General Permit had not been terminated. That legal theory, however, hinges on the mistaken assumption that there is no difference between violating a condition and being potentially jointly liable for an administrative penalty imposed for someone else's violation of the condition. Each permit condition that Tennessee Riverkeeper has cited, however, could only apply to a party with some manner of actual control of the site, which Afrakhteh did not have at the relevant times.

TDEC's authority to implement its water protection regime—including with regard to technical compliance—is broad, and, if TDEC determines that it is necessary to penalize someone like Afrakhteh, on the ground that he did not timely obtain termination of his permit coverage, then that might well be permissible. This case, however, has been brought by a private party under the CWA, and Congress chose to limit CWA citizen suits to claims filed against

11

parties alleged to be active polluters.[4] No provision of the CWA authorizes a citizen suit against a wholly past polluter, simply because that wholly past polluter failed to obtain a timely termination of its joint and several liability for state-law administrative penalties. Therefore, Afrakhteh is entitled to summary judgment, without prejudice to any issue other than whether Tennessee Riverkeeper was entitled to file a citizen suit against him on July 25, 2023.

## IV. CONCLUSION

For the foregoing reasons, Afrakhteh's Motion to Dismiss (Doc. No. 14), as converted to a motion for summary judgment, will be granted, without prejudice to any issue other than the permissibility of a citizen suit against Afrakhteh as of that date.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

---

[4] The court stresses that it does not mean to suggest that the citizen suit provision only permits claims against the specific party that discharged a covered effluent. For example, the court makes no holding regarding the availability of a citizen suit claim against a defendant that had actual, ongoing control over property from which another party discharged effluents. The court also makes no holding regarding a potential defendant who acted in concert with the direct polluter. Rather, the court's holding is limited to the specific situation presented—in which the defendant's only continuing connection to the alleged violations is that his coverage under an applicable permit has not yet been terminated.